[Filed May 23, 1890.]

## J.   K.   KELLY,   APPELLANT,   v.   DALLES   CITY, RESPONDENT.

DONATION CLAIM—MILITARY POST—WHEN CLAIM NO PART OF.—The right to take a donation land claim under the act of congress of September 27, 1850, creating the office of surveyor-general of the public lands in Oregon, and to provide for the survey thereof, and to make donation to settlers, did not attach to any tract or parcel of land selected for a military post or within one mile thereof unless the residence and cultivation of the claim was commenced previous to the selection. The settlement of the donation claimant upon the land will not, however, be adjudged to have been in volation of the said act, where it appears that he duly filed a notification of his claim with the surveyor-general, made proof of residence

and cultivation in accordance with the provisions of the said act, and that the same were duly received and acted upon by the land department, unless it is shown by competent proof that the selection was duly made prior to the settlement, although the land adjoining the claim was occupied at the time by United States troops as a military post.

DONATION CLAIM—PRESIDENT NOR SECRETARY OF WAR CANNOT SELECT AS A MILITARY RESERVATION.—Where a qualified claimant under said act of congress duly made a settlement upon the public domain, and filed a notification with the surveyor-general claiming a parcel of land described therein as a donation claim under the act; *held*, that neither the secretary of war nor the president had authority to select the land as a military reservation without his relinquishment thereof or making him due compensation thereof.

APPEAL from Wasco county: J. H. BIRD, judge.

The appellant commenced a suit in said court to have the respondent decreed to be the holder of the legal title to certain land in trust for appellant, and to execute a deed of conveyance of all its rights, title and interest therein to appellant, with such other and further relief as he might be entitled to in equity.

He alleged in his complaint that on the twenty-second day of November, 1853, one Winson D. Bigelow, being then a resident and settler upon a certain tract of land in Oregon, and duly qualified to enter the same as a donation claim under the act of congress approved September 27, 1850, commonly known as the "Donation Law," filed with the surveyor-general of Oregon a notice in writing, setting forth his claim to the benefits of the fourth section of said act of congress, and wherein he notified said surveyor general of the tract of land claimed by him, described as accurately as the same could be done in advance of the public surveys thereof; that said Bigelow personally resided upon and cultivated the said tract of land continuously from the first day of November, 1853, the time of his said settlement thereon, to the sixteenth day of February, 1860; and within three months after the survey thereof was made by the United States as a part of the public lands, he notified the register and receiver of the proper land-office of the precise tract of land claimed by him, and made his final proof of his said residence and cultivation, and of his having in all respects complied with the pro-visions of said act of congress, and the amendments

thereto, so as to entitle him to a donation of said tract of land; that afterwards, on the fifth day of May, 1881, the United States issued to said Bigelow a patent for all of said land except a portion thereof embraced in a patent which was wrongfully issued by the United States to the missionary society of the Methodist Episcopal church on the ninth day of July, 1875, also except a portion thereof which is embraced in what is known as the Harney military reservation; that appellant, by direct and mesne conveyance from the said Bigelow, succeeded to his title to that portion of the donation claim which lies between the western boundary thereof and what is known as the United States military reservation and Fort Dalles, as established by Brigadier-General Harney in the year 1859, which last described land is the parcel of land in controversy; that said military reservation, established in 1859, adjoined what was then the southern boundary line of Dalles City, the respondent herein; that the eastern boundary line of said Harney military reservation, commencing at the northeastern corner thereof, runs thence south 13° 30′ west, 19.16 chains, where it intersects and crosses the western boundary of the Bigelow claim, and continuing on in the same course south 13° 30′ west, runs 53 chains from said point of intersection upon the said donation claim, and running thence north 66° 34′ west, 17 chains, where it re-crosses the said western boundary of the donation claim, and thereby includes in said military reservation about 44 1-2 acres of land belonging to appellant; that appellant is the equitable owner of said 44 1-2 acres of land, and that the legal title thereof is in the respondent by virtue of a grant made under an act of congress, entitled "An act to provide for the disposition of useless military reservations," approved February 24, 1871, and is entitled to a conveyance of the legal title from the respondent.

The respondent filed an answer to the said complaint, denying all the allegations therein contained; and for a further answer averred that no part of said land was subject to be taken as a donation claim, for the reason that at

the time of the alleged settlement and filing thereon it was a part of a duly authorized and established military reservation known as Fort Dalles, which included ten miles square, was established by the president of the United States in 1848, and remained unchanged until sometime after the alleged settlement of the said Bigelow, and at the time thereof was actually occupied as such building, parade, and other grounds, a part of which was enclosed, and said enclosure included said grounds and the lands in controversy; that the east line of the part enclosed was commonly known as and called the eastern boundary line of the reservation; that in 1853 the said ten-mile reservation was reduced by the proper authorities to one mile square, the eastern boundary line of which reduced reservation conformed in all respects with the eastern boundary line of the part of the ten-mile reservation which was used for the particular purposes mentioned, and which was the most valuable and desirable part thereof. The respondent also charges in its said answer that the patent issued to said Bigelow was obtained by fraud and misrepresentation in certain particulars therein specified. Respondent further alleged that whatever interest it may have in said tract of land was obtained in the year 1871, since which time it has had the sole, exclusive and notorious possession of every part thereof; and that neither the appellant nor any of his grantors have ever been seized or possessed of any part of it for a period of more than ten years prior to the commencement of this suit.

The appellant filed a reply to the new matter contained in the answer denying the same.

The case was heard upon depositions, proofs and exhibits, upon which the circuit court found that the appellant had failed to sustain the allegations of his complaints, and thereupon decreed that it be dismissed, which is the decree appealed from.

*J. K. Kelly,* Appellant, *pro se.*

*F. P. Mays,* for Respondent.

THAYER, C. J., delivered the opinion of the court.

The decision of this case turns mainly upon the question as to whether the land claimed by the said Winson D. Bigelow as a donation claim was subject to be taken as such under said act of congress of September 27, 1850.  Said Bigelow was doubtless a qualified person to take a claim under said act, and, so far as I am able to discover, performed all the conditions and requirements necessary under it to entitle him to the benefit of its provisions; but it is earnestly contended by respondent's counsel that the claim would not attach to the parcel of land included in his notification for the reason that it was a part of a tract selected for a military post, or at least was within one mile of land reserved for the governmental purposes, and therefore invalid,

The history of the case shows that on January 29, 1848, the then secretary of war, the Hon. W. L. Marcy, made and published an order that the commanding officer of the military stations established on the route to Oregon make a reserve of ten miles square around the same, and cause it to be surveyed and divided off into suitable portions, the boundaries of which to be clearly marked by natural or other objects and indicated by numbers on a map to be prepared for the convenience of future reference.  A copy of this order was enclosed by the adjutant-general of the United States on February 2, 1848, to Lieutenant Colonel C. Wharton, 1st dragoons, commanding at Fort Leavenworth, directing him to furnish every commander of a post that might be established with a copy of the said order and to enjoin upon him a strict compliance with its requirements; that on June 22, 1850, Colonel Loring, commanding the 11th military department at Fort Vancouver, O. T., made a special order to the effect that Brevet Major S. S. Tucker, mounted riflemen, should, in establishing the military post at the Dalles of the Columbia river, make a military reservation of ten miles square; that he cause it to be surveyed by an officer of his command and

designate its limits by prominent natural objects (if any) and strong posts; that a plat of the reservation be sent to headquarters at Vancouver. A survey and map were introduced in evidence at the hearing, purporting to be a survey and map of a ten-mile military reservation at the Dalles, and to have been made by Geo. C. Bomford, surveyor, in 1852. Upon this map was endorsed the following certificate: "This survey of the military reservation at this post was made by Mr. Geo. C. Bomford, under a contract made with him on the tenth of September, 1852, by First Lieutenant John B. Gibson, 1st artillery, then in command of this post, acting under the order of Brevet Brigadier-General E. A. Hitchcock, commanding the Pacific division, headquarters Dalles of the Columbia river, Oregon Territory, thirty-first of October, 1853.

(Signed)                 "B. ALVORD, Captain,
            "Brevet Major U. S. A., commanding."

It further appears that on the eighteenth day of May, 1854, the then secretary of war, Hon. Jefferson Davis, made and published an order as follows:

"WAR DEPARTMENT, ⎱
"WASHINGTON, May 18, 1854. ⎰

"*General John E. Wool, Commanding Department of the Pacific*—SIR: It is represented to this department that a reservation of ten miles square has been made for military purposes at the Dalles of the Columbia, and that possession of this tract is claimed by the military authorities to the exclusion of persons claiming parts thereof. You will please cause a tract of not exceeding six hundred and forty acres to be selected for the use of the post, avoiding, as far as consistent with the public interest, all interference with private claims, and cause the limits thereof to be properly marked. You will also please have a plat thereof made and forwarded to this department with such a description of the tract that it can be platted in its proper position on the maps of the public lands. The selection of this tract being made carefully, and after full examina-

tion by competent officers, you will cause the commanding officer to relinquish possession of any other lands held at that place. Should the reservation include the improvements of any settler, made previous to the reservation, you will cause the value thereof to be ascertained, if possible, in a manner satisfactory to the owner, and report the amount in detail to this department.

"Very respectfully, your obedient servant,

"JEFF'N DAVIS, secretary of war."

The appellant concedes that in pursuance of this last order of the war department, a military reservation was duly established at the Dalles of the Columbia; but contends that no such reservation was established there prior to that time.

It appears that said Bigelow, on the twenty-second day of November, 1853, filed with the then surveyor-general of Oregon a notification of his claim to a donation of 320 acres of land under said act of congress of September 27, 1850, in which the boundaries of said claim were as follows: "Beginning at a point on the south bank of the Columbia river at a point where William C. Laughlin's west line intersects the Columbia river; running thence south 32° 30′, west 105 chains; thence east 72 chains; thence north 52 chains; thence west 15 chains; thence north 36° 50′ east to the place of beginning,—containing 320 acres, as appears by the annexed diagram."

Appended to said notification were field notes, purporting to be of a survey of said claim made September 4, 1853, by Justin Cheneworth. These notes were recorded in the land-office at Oregon City, October 6, 1853, and described the said claim as follows: "Beginning at the southwestern corner of W. C. Laughlin's claim; thence south 32° 30′ adjoining the military reservation, including Fort Dalles, 210 two-pole chains; witness oak 18 inches in diameter; thence 144 chains to the southern boundary of John A. Simms' claim, 13 chains north from the southwestern corner; witness oak 12 inches in diameter; thence along said boundary 107 [chains] to the northwestern

XIX. OR.—20

corner of said claim; thence west along the south boundary of Laughlin's claim 30 chains to the southwestern corner; thence along the western boundary of said claim 73 chains to the place of beginning."

A plat was drawn in the margin of said field notes indicating the shape of the claim; and accompanying the said notification and field-notes was the affidavit of the said Bigelow, to the effect that he was a white settler on the public lands, and that he arrived in said Territory on the —— day of October, 184—, and was a resident thereof on and before the first day of December, 1850; that he was a native-born citizen of the United States; that he was born in Massachusetts in 1823, and that he personally resided upon and cultivated that part of the public lands particularly described in his notification continuously from the second day of November, 1853, to the sixteenth day of February, 1860, and that he was not a married man.

It further appears that at the time of filing the said notification the lands upon which it was filed were unsurveyed lands of the United States, and that the same were not surveyed until February 4, 1860; that on the sixteenth day of February, 1860, said Bigelow filed with the surveyor-general of Oregon a notification of his claim to a donation of 320 acres of land, in which he described the same as "beginning at the northwest corner of the claim in section 3, 48.92 chains west 4.83 chains south of the corner of fractional sections 2 and 3; thence south 36.50 chains; thence east 16.25 chains; thence south 49.47 chains; thence west 71.02 chains; thence north 32° 30′, east 101.82 chains to the place of beginning"; that said notification was accompanied by the affidavit of the said Bigelow in the form of settler's oath upon final proof and cultivation of the claim, also the affidavits of two witnesses as to such settlement and cultivation thereof as required by said act of congress.

There is testimony in the case tending to prove that at about the time said Bigelow filed his original notification, Lieutenant Montgomery of the 4th infantry, who was then stationed at the Dalles military post, by order of Brevet

Major Alvord, who was in command of the post, surveyed a line from the northwest corner of the McLaughlin donation claim one mile south, which was recognized as the eastern line of said reservation, and that it coïncided with the west line of Bigelow's donation claim; that subsequently in the year 1854 or 1855, Major Rains, then in command at the post, caused a new survey of the reservation to be made, changing the line established by Montgomery and threw off a portion of it on the north for a townsite. It further appears that on the first day of January, 1859, certain parties petitioned the honorable secretary of war to relinquish to Dalles City that part of the said reservation lying between the first bluff and the Columbia river, and the bluff of rocks on the west bank of Mill creek and the line of the reservation, together with that portion lying east of a line extending from Second street south to a point parallel with the southern boundary of said city; and that on the second day of September, 1859, acting Secretary of War W. R. Drinkard made an order authorizing the commanding officer of the department of Oregon, at his discretion, to reduce the limits of the said reservation so as to leave the land referred to by the petitioners unoccupied; that the reserve, not exceeding one mile square, and including all the public buildings, should then be accurately surveyed, and the necessary plat and notes forwarded to the adjutant-general's office in order that it might be formally set apart for military purposes. The matter was referred to the commanding general by the assistant adjutant-general September 17, 1859. In pursuance of which order, General Harney ordered said reservation to be so surveyed, plats and notes to be transmitted to his office to be forwarded to the adjutant-general, that the reservation might be formally set apart for military purposes; that the northern limits of the reserve should not extend beyond the first bluff from the Columbia river, and should no inconvenience be found to arise to the military service when running the lines, the prolongation of Second street of the town of Dalles should mark the

eastern boundary; and Brevet Second Lieutenant Joseph Dixon, corps of topographical engineers, was assigned to the execution of the duty. On the twentieth day of December, 1859, said Joseph Dixon reported that he had completed the survey and also the triplicate maps of the reservation.

Under this proceeding the limits of the said reservation seem to have been definitely established. It will be seen from an inspection of the maps and reports of the surveys that the east line of the reservation as established by Lieutenant Dixon is the same as that attempted to be established by Major Rains. They differ, however, in their extent north; the former one "does not extend beyond the upper edge of the first bluff from the Columbia river"; while the latter, traced from south to north, continues to the "most eastern extremity of the rock at the mouth of Mill creek." They also differ in their extent south; the Rains line stopping "at a rock on the brow of the bluff marked with a cross," and the Dixon line extending several chains further south. Whether the said east line of said reservation was changed by the Rains and Dixon survey in its termini and course, from the line thereof as surveyed and located by Lieutenant Montgomery, is a material question between the parties.

It is claimed by appellant and the evidence tends to show that Lieutenant Montgomery established the initial point of the line at the northwest corner of the Laughlin donation claim, and ran thence south 32° 30′ west, one mile; while it is shown that Major Rains established the initial point of the eastern boundary of the reservation at the "most eastern extremity of the rock at the mouth of Mill creek" and ran thence south, 14° 23′ west, 64 pole chains and 30 links to a certain point indicated upon the map prepared by him.

The starting point of the Rains and Dixon east boundary line of the reservation, regarded as a continuous line, is some distance west from that of the Montgomery line, but its bearing west is 18° 7′ less than that of the latter; in

consequence of which it cuts across the same; and its southern terminus is some distance further east than that of the Montgomery line at its southern extremity.   This resulted in extending the easterly boundary of the southerly portion of the reservation on to Bigelow's donation claim as described in his notification, and the territory between said two lines south from the point where the Rains and Dixon line cuts across the Montgomery line constitutes the premises in controversy.

It further appears that at the time Bigelow filed his notification and made his final proof the missionary society of the M. E. church made a claim to about ninety acres off the northern and part of the western portion thereof. The claim of the said society was based upon an alleged occupancy of the land as a missionary station at the time of the establishment of the territorial government of Oregon under the act of congress of August 14, 1848, by virtue of a clause in the first section thereof, which provides: "That the title to the land, not exceeding 640 acres, now occupied as missionary stations among the Indian tribes in said Territory," etc., be confirmed and established in the religious societies to which said missionary stations respectively belong  That the matter was contested in the land-office and was finally decided by the secretary of the interior in favor of the latter, and a patent to the said 90 acres was thereafter and on the ninth day of July, 1875, issued to it.   And afterwards and on the fifth day of May, 1881, a patent was issued to said Bigelow for the said claim except the portion thereof patented to the said missionary society and the portion included between the said lines as before mentioned.

It further appears that in September, 1877, two suits were commenced against the said missionary society, one of them by James K. Kelly, Aaron E. Wait and Orlando Humason, and the other by said Kelly and Wait to test its rights under the said patent as against the claim of the said Bigelow, to the land included in his said donation claim; the plaintiffs in the respective suits claiming under

him, the said Bigelow. These suits were removed to the U. S. circuit court for the district of Oregon, where they were tried and a decree rendered to the effect that the said missionary society was the trustee for the plaintiffs therein of the legal title to said land, and that it convey the land to them; that an appeal was taken from the said decree to the supreme court of the United States and was there duly affirmed; the said last-mentioned court holding that the record clearly showed a full compliance by Bigelow with the law and established his right to the land in controversy which he afterwards conveyed to the appellees in the cases.

The evidence herein shows that in November, 1862, said Bigelow conveyed to appellant and said Wait the undivided one-third part of his said donation claim, except such portion thereof as he had previously sold; and that in December, 1864, he conveyed to said Humason the undivided two-thirds of the claim subject to the same exception; and that since said time and before the commencement of this suit the appellant had acquired Wait's interest therein and all the interest conveyed to Humason.

The allegation in the complaint that the land in controversy in this suit was claimed by the respondent Dalles City by virtue of an alleged purchase from the United States under the act of congress approved February 24, 1871, entitled an act to provide for the disposition of useless military reservations, seems to be sustained by the proofs in the case, although the respondent's counsel strongly contended to the contrary at the hearing. Said counsel insisted that the said act of itself was not sufficient to confer the legal title upon the respondent, and that there was no proof in the case that the latter had complied with its terms. I have not the act before me, and my only recollections of its terms are that it granted to the respondent certain lands, including the premises in question, upon the payment of five dollars an acre therefor. Whether the act is sufficient to convey the legal title to the land to the respondent without proof of the payment by the latter

of the five dollars an acre therefor, may be somewhat questionable, but I find among the exhibits in the case of *Kelly* v. *Pike*, which the parties herein stipulated should be used as evidence in this case, the following:

"U. S. LAND-OFFICE, Oregon, May 12, 1881.

"It is hereby certified that the records of this office show that by the act of February 24, 1871, authorities of Dalles City, Oregon, were allowed to make cash entry No. 1161, at Oregon City land-office on April 8, 1872: Part N. W. $\frac{1}{4}$ and part S. W. $\frac{1}{4}$ Sec. 3, and part N. E. $\frac{1}{4}$ and part S. E. $\frac{1}{4}$ Sec. 4, and part N. E. $\frac{1}{4}$ Sec. 9, and N. W. $\frac{1}{4}$ Sec. 10, all in township 1 N., of R. 13 E. W. M.; containing 162.51 acres at five dollars per acre, $812.55, and paid therefor on said April 8, 1872, at the rate of $5 per acre.

(Signed)          "F. A. McDONALD, register."

Attached to this is a certificate in the usual form by the register as register of the U. S. land office at The Dalles, Oregon, to the effect that he had compared the same with the original entries made in the records of that office in said matter in the purchase of the land by Dalles City, and that it was a true and complete copy thereof, and the whole thereof, together with a map of the same. And to which was appended a small map or plat showing the location of the premises.

The counsel for the respondent has interposed several other objections to the appellant's right of recovery herein, but it seems to me that the question suggested in the outset, as to whether the land claimed by Bigelow could be lawfully taken as a donation claim, is the only one which in any wise is doubtful.

If the land claimed by Bigelow was, at the time he filed his first notification, a part of a military reservation, he had no legal right to settle thereon and attempt to take it as a donation claim under said act of congress of September 27, 1850; as section 14 of said act reserves such portions of the public lands as may be designated under the authority of the president of the United States for forts, magazines,

arsenals, dock-yards, and other needful public uses, from the operation of the act. And section 9 of said act provides that such claim shall not attach to any tract or parcel of land selected for a military post, or within one mile thereof, or to any other land reserved for governmental purposes, unless the residence and cultivation thereof shall have commenced previous to the selection or reservation of the same for such purposes.

The legality of the attempt upon the part of Bigelow to take the said donation claim depends, therefore, upon the fact whether, on the second day of November, 1853, the date of his settlement, the land claimed by him had been designated under the authority of the president of the United States for the purposes mentioned, or had been selected for a military post, or was within one mile thereof, or had been reserved for governmental purposes.

It cannot be maintained from the proof that a military reserve of ten miles square was ever established at the point in question. No authority was shown for locating any such reservation at that place. The order of Secretary Marcy was only to the effect ''that the commanding officer of the military stations established on the route to Oregon should make a reserve of ten miles square around the same,'' etc. The order was directed to the commanding officer of military stations which had been established, and established on the route to Oregon. It had no reference to stations of that character which were to be established at a particular locality in Oregon. The establishment of such a station required a special order under the authority of the President of the United States, and before we can conclude that any military station was established at the Dalles it must appear that such an order was pro mulgated by his authority. The adjutant-general, Mr. R. Jones, in referring the matter to Colonel Wharton, used, it is true, the words ''to be established on Oregon route''; but that was not the order made by the honorable secretary of war. The order of Colonel Loring to Major S. S. Tucker that he would, ''in the establishment of the mili-

tary post at the Dalles of the Columbia river, make a military reservation of ten miles square," does not appear to have been made in accordance with any authority competent to select land for a military post, and the subsequent order of the then secretary of war, Jefferson Davis, dated May 13, 1854, indicates that none had been given, although he recognized the fact that a reservation of ten miles square had been made for military purposes at the Dalles of the Columbia, and that possession of such tract was claimed by the military authorities to the exclusion of persons claiming parts thereof.

The inference to be drawn from the proofs in the case is, that the military authorities located a site at the Dalles of the Columbia for a military post; that they entered into occupation of it with the expectation that a tract or parcel of land would ultimately be selected by the president of the United States at that point for such purpose. Until such time its limits could not be defined and fixed. It was doubtless in view of such selection being made that Bomford, in pursuance of a contract with Lieutenant Gibson, surveyed the tract of land shown upon the map prepared by him October 31, 1852, and that the surveys and maps before referred to were made. This work was all done without any authority from the president except the survey and map made by Lieutenant Dixon. That work was done by the acting secretary of war, Hon. W. R. Drinkard. In the order made by the latter, dated September 22, 1859, after authorizing the commanding officer of the department, at his discretion, to reduce the limits of the reservation, etc., directed that "the reserve, not exceeding one mile square, and including all the public buildings, be accurately surveyed and the necessary plat and notes forwarded to the adjutant-general's office at Washington, in order that it might be formally set apart for military purposes. This order was referred to the commanding general of the department, General Harney, for execution, who assigned Lieutenant Dixon to execute the duty, and subsequently forwarded the map of the military reserve at

Fort Dalles, as so laid off, to the adjutant-general at Washington City, D. C. It is apparent that until this time the site of the reservation was not regarded as having been authoritatively established. If it had been, Bigelow, Laughlin, and Simms would not have been likely to have taken donation claims in so close proximity to it, nor the surveyor-general of Oregon have allowed their notifications thereon to be filed in his office and proof made of their compliance with the provisions of the donation law. Bigelow certainly knew he could not take a donation claim upon a military reservation, nor within one mile of a military fort, duly established as such, and it is not probable that he attempted to do so, and highly improbable that the land department would permit it to be done. The fact that he obtained a patent to the larger part of the claim notified upon, and that his grantees established in the United States courts that, by virtue of his settlement, residence and cultivation, he was entitled in equity, under the donation act, to the part thereof patented to the missionary society of the M. E. Church, are very convincing proofs that his settlement was lawful; which could not have been the case if the site for the post had been formally set apart by the proper department for military purposes. And if his settlement were lawful under the said act, his claim could not be rightfully encroached upon by the secretary of war or the president, any more than it could be rightfully claimed by the missionary society under the decision of the secretary of the interior, and the patent issued in accordance therewith.

The settlement and compliance with the law authorizing it, secured to Bigelow and his grantees a vested right in the claim notified upon, of which they cannot be deprived by the exercise of any power of the government for any purpose without payment of just compensation. Nor did the secretary of war, acting under the authority of the president, have power to include in the said reservation any part of the claim of the said Bigelow after his settlement thereon and the filing of his notification, if the

settlement were legally made without his relinquishments thereof; or making to him such compensation therefor.

The part of the donation claim included in what is known as the "Harney reservation," as surveyed and platted by Lieutenant Dixon, equitably belongs, in my opinion, to the appellant as grantee, directly and indirectly, from said Bigelow; and he is entitled to the relief prayed for in his complaint.

I think, however, that, as the respondent Dalles City has paid to the United States at the rate of $5 per acre for the land in controversy, it should not be required to pay costs and disbursements herein; but that the appellant should be required to pay all disbursements in this court and in the circuit court.

A decree will be entered herein in accordance with the principles of this opinion.